FILED

98 JUN 25 PM 3: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MONICA COLEMAN,** | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ] CV-97-N-1043-S |
| | ] |
| **WESTERN AUTO SUPPLY** | ] |
| **COMPANY,** | ] |
| | ] |
| Defendant(s). | ] |

ENTERED

JUN 25 1998

### Memorandum of Opinion

**I.    Introduction.**

In this employment discrimination action, the plaintiff, Monica Coleman ("Coleman"), asserts claims against defendant, Western Auto Supply Company ("Western Auto"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981.[1] Specifically, Coleman contends that she has been discriminated against on the basis of her race, African American, and sex, female, in job assignments, hiring, promotions, pay, termination, and other terms and conditions of employment, and has suffered damages, including mental anguish. *Complaint* at ¶ 12.

---

[1] Rodney Porterfield filed a complaint on February 7, 1997, alleging Title VII and 42 U.S.C. § 1981 race discrimination claims. On April 15, 1997, Porterfield's counsel filed a "Motion to Amend the Complaint" requesting that Monica Coleman and Jurail Chancellor be added as parties in Case No. CV-97-P-0332-S On April 25, 1997, the court granted the motion to amend as to Chancellor and denied it as to Coleman. Therefore, Coleman subsequently filed this action.

The case is presently before the court on the defendant's motion for summary judgment, filed on March 16, 1998.   The motion has been fully briefed and was submitted for decision at the court's regularly scheduled motion docket on April 29, 1998. Upon due consideration, the motion will be granted.

## II.   Statement of Facts.[2]

Coleman applied for a position at Western Auto on March 16, 1993.   On her Western Auto job application, she applied for the following positions: (1) parts and management, and (2) cashier.   At the time she applied, Coleman preferred a parts position over a management position because her daughter was receiving Social Security disability benefits.   If Coleman earned over a certain amount of income her daughter would become ineligible for the benefits. Because Coleman had experience selling parts from her employment at AutoZone, she preferred a parts position over a cashier position. Coleman talked to John Key ("Key"), General Manager of the Midfield Western Auto, about working as a parts salesperson for $6.00 an hour.   Coleman and Key did not discuss a management position on the day Coleman applied at Western Auto.   Coleman stated on her Western Auto application that the reason she was leaving her previous job at AutoZone was "to get out of management to spend more time with my daughter." *Defendant's Exhibit 2*

The managerial staff of a Western Auto store was as follows:   General Manager,

---

[2] The facts set out below are gleaned from the panties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.   These are the "facts" for summary judgment purposes only.   They may not be the actual facts.   *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2

who was the highest ranking member of management working in the store on a day to day basis; Store Managers (commonly known as Assistant Managers), who worked directly under the General Manager in the stores; and District Managers, who were responsible for a specific geographic location or area and were immediately over the General Managers.

On April 4, 1993, Western Auto hired Coleman as a parts salesperson at the · Midfield store at a rate of $6.00 an hour. On May 19, 1993, Western Auto hired Lester Casey ("Casey"), a white male, as a parts salesperson at the Midfield store. Coleman alleges that, although she had more experience than Casey from their prior employment at AutoZone, Western Auto hired Casey in at $6.50 an hour. Coleman discovered Casey's rate of pay when a payroll sheet was left on Key's desk, and Coleman looked at it. Coleman said she complained to Key about the pay disparity two or three weeks after Casey began working. Coleman stated that when she asked Key why Casey was earning more than her, Key just chuckled and walked on.

In December 1992, Western Auto hired William E. Burns, a white male, as a full-time parts salesperson at $6.00 an hour. Mr. Burns maintained his rate of pay until his employment with Western Auto ended in May 1993. On June 30, 1993, Western Auto hired James Dewayne Harris, a white male, as a full-time parts salesperson for the Bessemer Western Auto at a rate of $6.00 an hour. In April 1993, Western Auto hired Charles House, a white male, at an hourly pay rate of $5.00. House left employment with Western Auto in September 1994, making $6.00 an hour as a full-time installer. In July 1993, three months after being hired, Coleman received a raise to $6.50 an hour.

3

When Coleman began working at the Midfield store, the District Manager of the Birmingham area  Western Auto stores was Mr. Whitfield.[3] Coleman claims she was discriminated against by Mr. Whitfield because he did not place her in a managerial position when she began her employment with Western Auto.  A  co-employee told Coleman that Mr. Whitfield was not going to be making any changes in the employee positions at the time Coleman was hired because Mr. Whitfield was going to be retiring soon and did not want to make any changes.  Soon after Coleman began work,  Mr. Whitfield retired and Harold Markel ("Markel") replaced him.

In September 1993,  Markel  and Regional Human Resource Manager Tony Taliercio  approached  Coleman about the possibility of Coleman being promoted to a Store Manager position. Coleman was subsequently offered the Store Manager position at Midfield. However, before accepting the position, Coleman had to make sure that the increase in pay did not cause her daughter to lose her Social Security disability benefits. After consulting an attorney and the Social Security office, Coleman accepted the position and was promoted to Store Manager of the Midfield location on September 29, 1993.

Two or three weeks before Coleman became the Store Manager at Midfield, Western Auto  placed Lanny P'Pool ("P'Pool"), a white male, in a Store Manager's position at the Woodlawn Western Auto.  Coleman never requested the Store Manager position at the Woodlawn Western Auto.  At approximately the same time as Coleman's

---

[3]  After a thorough examination of the record, the first name of Mr. Whitfield was not revealed.

4

promotion, Western Auto placed Rodney Porterfield ("Porterfield"), a black male, as a Store Manager for the Centerpoint Western Auto.

On March 1, 1994, Anita Enfinger ("Enfinger") replaced Markel as District Manager over the Birmingham Western Auto stores. Coleman alleges that on one occasion, Enfinger refused to give her a salary increase and this refusal constituted discrimination based on her race and sex. Coleman says that the refusal to give her a salary increase was discriminatory in regard to her race because she had gone the "extra mile." *Coleman's Nov. 24, 1997, Deposition* at 50. Coleman's evidence that the denial of salary increase was because of her sex was "just out of hearsay." *Coleman's Nov. 24, 1997, Deposition* at 51. Coleman does not recall where she was working at the time of the request for the salary increase but stated that it was either the Bessemer or Woodlawn store.

In August 1994, Coleman was transferred from the Midfield store to the Bessemer store as Store Manager, at her request. At the time of Coleman's transfer, Enfinger gave Tom Sweeting ("Sweeting"), a white male, the General Manager position of the Bessemer store. Coleman believes that Western Auto should have given the General Manager position at the Bessemer store to her instead of Sweeting. Coleman stated that on the day Enfinger told her of Sweeting's appointment, she did not inform Enfinger that she wanted the General Manager position of the Bessemer store.

In July 1995, Coleman transferred from Store Manager of the Bessemer Western Auto to Store Manager of the Woodlawn Western Auto. At the same time, Western Auto promoted Porterfield  to General Manager of the Woodlawn store. Porterfield had

5

previously held the General Manager position at the Bessemer store. Although Porterfield maintained the same job title, the move was viewed as a promotion because the Woodlawn store was a higher volume store and General Managers received bonuses based on store volume. Coleman stated that Enfinger wanted her to transfer to the Woodlawn store because the Woodlawn store was having problems, and she believed that Coleman and Porterfield could work well together and turn the store around.

P'Pool held the General Manager position at the Woodlawn store before Porterfield. P'Pool and Porterfield switched locations, and P'Pool became General Manager of the Bessemer store as Porterfield became General Manager of the Woodlawn store. The move by P'Pool to the Bessemer store was viewed as a demotion because of the decrease in store volume. Coleman claims that she should have been promoted to General Manager of the Bessemer store instead of P'Pool being transferred there because P'Pool had violated company policy by allegedly handling paid-outs[4] incorrectly, failing to pay bills from creditors, and making errors in the paperwork. Coleman stated that she did not want the General Manager position at the Woodlawn store, but "was sort of angry because they didn't offer [Porterfield's General Manager job at Woodlawn] to me so I could have turned it down." *Coleman's Oct. 21, 1997,*

---

[4]  Paid-outs are slips where management is able to take money out of the safe to buy supplies and other needs for the stores. Under Western Auto company policy, management must document taking money out of the safe to buy supplies or other items. Upon returning with the supplies, the manager is required to attach the receipt from the purchase to a fully completed paid-out form. This form with the receipt attached is then sent to the Western Auto home office where the form is evaluated, and a check is sent to the store for reimbursement. A manager is supposed to send the paid-out form within two weeks of the purchase in order to get reimbursed. A receipt is supposed to be attached before the home office sends a check for reimbursement.

6

*Deposition* at 219.

Coleman did not want to transfer to the Woodlawn store because the Woodlawn store was further away from her home. Coleman asked for compensation due to her additional expense of driving further to the Woodlawn store, but her request was denied. Coleman alleges that Enfinger told her that P'Pool was coming to the Bessemer store and that Enfinger did not think that Coleman and P'Pool would work well together. However, Coleman stated that neither Enfinger nor any member of management of Western Auto told her that P'Pool did not wish to work with black people or women. Coleman stated that working with P'Pool was probably impossible because P'Pool did not work on Sundays and Coleman could not work every Sunday. After arriving at the Woodlawn store, Coleman claimed Enfinger complained about the Woodlawn paperwork being out of order. Coleman claims the paperwork was out of order because of P'Pool's management of the store. Enfinger did not discipline Coleman for the alleged disorderly paperwork.

In March 1996, John Anisko ("Anisko"), Senior Auditor for Western Auto at the time, conducted a routine audit of the Woodlawn store. During his audit, Anisko discovered four or five paid-outs and a void-after[5] that had been handled in violation of Western Auto company policy. The paid-outs were handled by Porterfield and Coleman entered the void-after. Anisko phoned Sam Moore ("Moore"), Western Auto Loss Prevention Investigator, and told him about the paid-out and void-after problems.

---

[5]   A void-after, or sales cancellation, is a mechanism whereby a manager voids an incorrectly entered sale, deleting the sale from the sales records. The transaction is then to be entered correctly.

Anisko left the documents and a note relating to the void-after and the paid-outs in an envelope for Moore at the Midfield store. After receiving Anisko's information, Moore began an investigation of Porterfield and Coleman, which included interviewing other employees of the Woodlawn store.

Anisko found two paid-outs from December that had never been sent to the home office. Two or three other paid-outs had been received by the home office and reimbursed, although no receipts had been attached to the paid-out forms. Anisko stated that company policy required managers to send receipts attached to the paid-out forms, but he had no control over whether the home office reimbursed the stores for paid-outs with no receipts attached.

The void-after that Anisko discovered was entered into the computer under Coleman's employee number. The transaction involved was a sale for tires and other merchandise totaling $215.73. Less than ten minutes after the sale, Coleman issued a void-after for the sale. The sale was never re-entered. Coleman claimed that this was in fact a refund and that she entered the void-after because there were other customers waiting and because it was faster to do a void-after than a return. However, Anisko claims that he called the customer who had bought the tires and other items on the initial sale and that the customer told Anisko he was very pleased with the tires he had purchased. Anisko claims, and Coleman admits, that the void-after transaction was not handled according to company policy.

On April 3, 1996, Moore and Doug White ("White"), who replaced Enfinger as District Manager of the Birmingham district of Western Auto, called and requested that

8

Porterfield meet them at the District office at the Midfield store. Porterfield was questioned about the improperly handled paid-outs and his employment was terminated on April 5, 1996, for violation of company policy.

Following their interview with Porterfield, Moore and White called Coleman at the Woodlawn store and asked to meet with her at the District office at the Midfield store. Coleman alleges that during the meeting Moore questioned her about Porterfield's actions. Coleman said Moore threatened to call the police unless she told him that Porterfield had been stealing. However, Moore denies ever making this statement. During the interview, Coleman admitted to improperly handling the void-after and stated she had improperly conducted other void-afters in the past. Coleman signed a statement prepared by Moore containing several questions and responses.

Manny Blackner ("Blackner"), who had become Regional Human Resources Manager for the Birmingham area on March 1, 1996, came into the Midfield store during the meeting between Coleman, Moore and White, but was not aware that the meeting was taking place. As Moore was leaving, he briefly discussed the situation with Blackner and told him that there were paid-out and void-after discrepancies but did not mention Coleman or Porterfield. After the meeting, White informed Blackner that he and Moore had interviewed Coleman and Porterfield concerning the paid-outs and void-after problems. Blackner, along with White, then met with Coleman to discuss the void-after in question. After meeting with Coleman, Blackner and White decided to terminate Coleman for violation of company policy. Later that day, White called Coleman back to the Midfield store and informed Coleman that she was being

9

terminated from Western Auto.

Moore prepared an investigative report on his findings regarding the paid-outs and void-after. Although Moore stated that he sent a copy of the investigative report to Blackner, Blackner stated that he never saw the investigative report until the day he was deposed by Coleman's attorney. Blackner approved Coleman's termination without reading the investigative report prepared by Moore or reviewing Coleman's personnel file.

Walter Green ("Green"), a black male who, along with Coleman, was a Store Manager at the Woodlawn store, was promoted to General Manager of the Woodlawn store when Porterfield was terminated. Coleman believes she was terminated so that Walter Green could be promoted to General Manager because they wanted a strong male in that position.    Neither White nor Blackner knew that Coleman desired the General Manager position at the Woodlawn store. Both Porterfield and Coleman allege that Green told lies about both of them in order to get them fired. Porterfield alleges that Green took merchandise from Western Auto and no disciplinary action was taken against him. After her termination, Coleman was replaced by John Bailey, a black male.

At approximately the same time that Coleman and Porterfield were terminated, two white employees, Troy Tippons ("Tippons") and Brad Anderson ("Anderson") were also terminated.    Tippons,  General Manager of the Forestdale store, was terminated for leaving the store without a manager in charge during lunch hour while he went home to watch television. Anderson, Store Manager of the Forestdale store, was terminated for working on his truck while at work and neglecting to pay for the work.

White terminated both Tippons and Anderson without knowledge of any prior problems and without reviewing their personnel files.

Coleman alleges that male managers of Western Auto were treated differently than female managers. Coleman alleges that Porterfield, Sweeting, Ken Wyatt ("Wyatt"), Key, and P'Pool wrote IOUs for money from the store safes. Coleman alleges that when she became Store Manager at the Woodlawn store, she found IOUs in the safe with Larry P'Pool's name on them. Coleman did not tell anyone at Western Auto about the IOUs and threw them away. Coleman also alleges that General Managers Key, Wyatt, and P'Pool, all white males, violated company policy in regard to void-afters. However, Coleman did not report any of the alleged violations with regard to the void-afters to anyone at Western Auto. Sweeting and Key were not employed at Western Auto when Blackner and White took over the Birmingham area stores. Coleman stated that, during the investigation of her conduct in April 1996, she told Moore that Wyatt had written IOUs when he worked at the Midfield store. However, at the time of Coleman's investigation, Wyatt was employed by Western Auto in another state.

Porterfield testified that white managers were treated differently than black managers. Porterfield claims that Teresa Sherrer ("Sherrer"), a white female, took money from the cash register and that Key took money out of the store. Porterfield also alleges that Wyatt lost a bank deposit and that Store Manager Ronald Kornegay ("Kornegay"), a white male, lost money. White and Blackner stated they had no knowledge of Wyatt losing a bank deposit or of Kornegay losing money. Sherrer, Key

11

and Sweeting were no longer employed at Western Auto at the time White and Blackner began work for Western Auto in the Birmingham area. Wyatt transferred to Colorado a few weeks after White became District Manager of the Birmingham area .

Jurail Chancellor testified that P'Pool stole oil and tires from the Woodlawn store when P'Pool was General Manager. Blackner testified that he had no knowledge of the alleged theft and that no one ever came and complained to him about P'Pool. Blackner stated that a General Manager getting behind on paying his bills is not grounds for immediate termination. White admitted that P'Pool's store standards were terrible but he did not remember writing P'Pool up for paperwork problems. White claims that no one ever brought to his attention P'Pool's alleged problems with the store safe at the Woodlawn store.

Coleman alleges that Moore used racial remarks about an employee at Western Auto. Coleman discovered a black woman named "Rosy" was stealing from Western Auto. Coleman informed Moore about the alleged theft, and Moore proceeded with an investigation. Coleman testified that Moore was talking on the phone and stated to the person on the phone, "yeah, yeah, I finally got her. These niggers. . ." *Coleman's Oct. 17, 1997, Deposition* at 447. Coleman stated that when he saw her, Moore stopped talking and closed the door. Moore denies making the statement in relation to his investigation of "Rosy." Coleman also alleges that during Moore's investigation of "Rosy," Moore told Coleman, "I've been after this bitch for years." *Coleman's Oct. 17, 1997, Deposition* at 449. Coleman alleges that Moore used the word "bitch" one time. Moore denies using the word "bitch" in relation to his investigation of "Rosy."

12

Coleman and Porterfield claim that White allowed white managers to call him

"Doug," while black managers were told to call him "Mr. White." Coleman stated that,

on the day White was introducing himself to the employees at the Woodlawn location

where Coleman was Store Manager and Porterfield was General Manager, Coleman

called him "Doug" and White politely asked her to call him "Mr. White." Porterfield

alleges that White told Porterfield to call him "Mr. White" and not by his first name

"Doug." Coleman alleges that, on one occasion, she heard P'Pool address White as

"Doug." Porterfield stated that he never heard a white employee address White as "Mr.

White." Green, a black Store Manager, stated that he called White both "Mr. White"

and "Doug," but that White told him he preferred to be called "Doug." *Green Affidavit*

at page 2.

On June 10, 1996, Coleman filed a charge of discrimination with the EEOC

against Western Auto, alleging racial and sex discrimination. She filed the instant action

on April 27, 1997.

## III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

party asking for summary judgment "always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

13

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant.

14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judges's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every

15

inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

Coleman claims that Western Auto discriminated against her on the basis of gender and race in the following instances: (1) when she was hired as parts salesperson rather than a Store Manager; (2) when Lester Casey, a white male, was hired at the same position at a higher rate of pay than Coleman; (3) when Anita Enfinger failed to give her a raise on one occasion; (4) when Tom Sweeting was placed in the General Manager position at the Bessemer store rather than Coleman; (5) when she was transferred from the Bessemer store to the Woodlawn store; (6) when she was terminated from her Store Manager position in April 1996; (7) when Sam Moore allegedly used the words "bitch" and "nigger" when referring to an employee named "Rosy;" and (8) when Doug White allegedly told Coleman and Porterfield to call him "Mr. White" while allowing white employees to call him "Doug." Coleman's claims under Title VII[6] and § 1981[7] are based on the same facts, and the following analysis,

---

[6] Title VII provides, in relevant part:

> (a) It shall be unlawful employment practice for an employer-
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e-2 (1981).

[7] Section 1981, as recently amended, provides:

> (a) statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and shall be subject to like punishment, pain, penalties, taxes, licenses and exactions of

16

therefore, will apply equally to each cause of action. *Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n. 2 (11th Cir. 1997).[8]

## A. Coleman's Hiring Claim.

Coleman's hiring claim is based on the allegation that, when she was hired at Western Auto, she should have been made Store Manager at either the Centerpoint or the Woodlawn store. Coleman admitted that no one was placed in management positions at the time she was hired because the District Manager at the time, Mr. Whitfield, intended to retire soon and did not want to make any changes. When Mr. Whitfield left Western Auto, Coleman filled a Store Manager position at Bessemer, P'Pool filled a Store Manager position at Woodlawn, and Porterfield filled a Store Manager position at Woodlawn.

Coleman's opposition brief does not dispute Western Auto's motion for summary judgment with regard to her hiring claim. In *Ryan v. International Union of Operating Eng'rs, Local 675*, the 11th Circuit stated that "a party may not rely on his pleadings to avoid summary judgment." 794 F.2d 641, 43 (1986); *see Road Sprinkler Fitters Local*

every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C.A. § 1981 (West 1994).

[8] In *Runyon v. McCrary*, the Supreme Court of the United States held that § 1981 does not provide a remedy for discrimination based on gender or religion. 427 U.S. 160, 167 (1976). Therefore, all of Coleman's gender claims under § 1981 are due to be dismissed.

*Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) ("It could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment."). Because Coleman abandoned the hiring claim, it is due to be dismissed.

Even if Coleman's hiring claims were not abandoned, her claim is still barred by the applicable two-year statute of limitations.[9] To maintain an action under § 1981, Coleman's alleged discriminatory hiring must have occurred no earlier than April 27, 1995. Coleman was hired by Western Auto in April of 1993. She was promoted to Store Manager of the Midfield store on September 29, 1993. Because both of these events occurred more than two years before Coleman filed an action under § 1981, Coleman's hiring claim under § 1981 is barred by the two-year statute of limitations.

Coleman cannot maintain an action under Title VII on her hiring claim either. Title VII requires that an employee file an EEOC charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5; *Welty v. S.F. & G., Inc.*, 605 F. Supp. 1548, 1553 (N.D. Ala. 1985). Coleman filed her EEOC charge on June 10, 1996, more than three years after she was hired and more than two-and-one-half years after P'Pool and Porterfield were placed in store management positions.

Even if Coleman's hiring claims were not time-barred, which they are, then

---

[9]   Section 1981 does not provide a statute of limitations period. In *Wilson v. Garcia,* the Supreme Court held that where a federal statute does not contain a limitations period, courts should look to the most analogous state statute of limitations. 471 U.S. 261, 266-67 (1985). All actions for any injury to a person or rights of another not arising from contract and specifically enumerated in Alabama must be brought within two years. *Ala. Code* § 6-2-38(1). Therefore, the applicable statute of limitations for claims brought under § 1981 is two years. *Dunnin v. General Electric Co.*, 892 F. Supp. 1424, 1425-26 (M.D. Ala. 1995).

18

Western Auto is still entitled to summary judgment. In order to prevail under Title VII, Coleman must prove that Western Auto acted with a discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Likewise, § 1981 requires discriminatory intent. *Firefighters Local Union No. 1784 v. Shotts*, 467 U.S. 561, 583 n.16 (1989).

Coleman can create a rebuttable presumption of discriminatory intent by establishing a *prima facie* case. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). This may be done in three ways: (1) "by presenting direct evidence of discriminatory intent; (2) by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), or (3) by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990.)

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City if Miami*, 870 F.2d 578, 581-582. (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate. . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted). A second means by which Coleman may establish a *prima facie* case is by presenting statistical evidence that demonstrates a pattern and practice of gender or racial discrimination on the part of Western Auto. *See Early*, 907 F.2d at 1081. Coleman has presented no direct evidence or statistical data in regards to her hiring claim; therefore, she must attempt to establish a *prima facie* case of discrimination through circumstantial evidence.

19

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a *prima facie* case of discrimination. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).    The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.*    "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present "significantly probative" evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The

20

plaintiff may prove that the defendant intentionally discriminated against him "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.).

To establish a *prima facie* case of hiring discrimination, Coleman must show (1) that she belongs to a protected class; (2) that she applied and was qualified for a job for which the employer was seeking applications; (3) that despite her qualifications, she was rejected for the job she sought; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants from person's of the plaintiff's qualifications. *McDonnell Douglas*, 411 U.S. at 802.

Coleman is a member of a protected class. However, she has failed to proffer evidence that she met the other three elements. Coleman claims that she was discriminated against in hiring because she was not hired in as a Store Manager at the

21

Woodlawn or Centerpoint store. However, Coleman listed on her Western Auto application that she was leaving her previous employment at AutoZone because she wanted to get out of management to spend more time with her daughter. Coleman also stated that she preferred a parts position over a management position because her daughter was receiving disability benefits and because only a certain amount of income could be earned and still remain eligible for the benefits. Because she was hired in at one of the positions for which she applied and because that position was the one she preferred, Coleman cannot establish that she applied and was qualified for a position for which the employer was seeking applications or that she was rejected for the job she sought.

Next Coleman stated that at the time she was hired, Mr. Whitfield, the District Manager, was not making any changes in the employee structure at Western Auto. There is no contention that anyone was hired as Store Manager at the time Coleman was hired, that she was rejected for a Store Manager position, or that Western Auto was seeking applicants for Store Manager. Therefore, Coleman cannot establish a *prima facie* case of hiring discrimination.

Even if Coleman could establish a *prima facie* case of discrimination in hiring, the burden of production would then shift to Western Auto to provide a legitimate, nondiscriminatory reason for her being hired as a parts salesperson rather than a Store Manager. In this case, Coleman stated that she preferred a parts position rather than a Store Manager position. There is no evidence that Coleman being given the job she preferred was a pretext for gender or racial discrimination. See *Combs v. Plantation*

22

*Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (to show pretext, plaintiff must present sufficient evidence that casts doubt on the nondiscriminatory reason). Coleman thus cannot prove that Western Auto's legitimate nondiscriminatory reason for not hiring her as Store Manager is pretext.

Accordingly, Coleman's hiring claim is due to be dismissed for the following reasons: (1) the claim was abandoned; (2) it is time-barred; (3) no *prima facie* case of hiring discrimination was established; (4) Western Auto offered a legitimate nondiscriminatory reason for not hiring Coleman as Store Manager; and (5) Coleman cannot rebut Western Auto's legitimate nondiscriminatory reasons.

### B. Coleman's Pay Claim.

Coleman also claims that she was discriminated against on the basis of her pay. Coleman's pay claim is based on two allegations: (1) Lester Casey, a white male, made 50 cents an hour more than she did while she worked as an hourly salesperson, and (2) on one occasion, District Manager Anita Enfinger did not give her a salary increase. As in the hiring claims, Coleman abandoned both of these claims because she alleged the pay claims in her complaint but did not defend them against summary judgment. See *Independent Sprinkler*, 10 F.3d at 1568 (11th Cir. 1994).

However, even if Coleman had not been found to have abandoned her pay claims, the pay claim alleging pay disparity is still barred by the applicable statute of limitations. The applicable statute of limitations for a § 1981 claim in Alabama is two years. *Dunnin*, 892 F. Supp. at 1425-26. Coleman admits that she was aware of the alleged pay disparity involving Casey in 1993. Because Coleman filed her claim in April

1997, more than three-and-one-half years after the alleged 1993 disparate pay claim, her § 1981 race claim is not timely. Coleman filed her EEOC charge on June 10, 1996, more than two-and-one-half years after the alleged 1993 discriminatory event involving Casey. Because she did not file her EEOC charge within 180 days after the alleged unlawful employment practice, her Title VII race and sex claims are also barred.

Coleman's second claim, that District Manager Anita Enfinger discriminated against her when Enfinger refused to give Coleman a salary increase on one occasion, is also due to be dismissed. Coleman does not remember where she was working when she asked Enfinger for the salary increase. Under § 1981, the applicable statute of limitations in Alabama is two years. *Dunnin*, 892 F. Supp. at 1425-26. Enfinger became District Manager in 1994 and remained in that position until March 1, 1996. Coleman claims that she asked Enfinger for the raise while she was either at the Bessemer or Woodlawn store. Coleman began work at the Bessemer store in August of 1994 and worked at the Bessemer store until she was transferred to the Woodlawn store in July 1995. Coleman filed her complaint on April 27, 1997. Therefore, to the extent that the denial of a salary increase occurred prior to April 27, 1995, that claim will be barred by the statute of limitations.

Title VII requires that an employee file an EEOC charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5. Coleman filed her EEOC claim on June 10, 1996. Again, Coleman cannot establish that she filed her EEOC claim within 180 days of the alleged employer discriminatory act. *See Welty*, 605 F. Supp. at 1553 (holding that plaintiff bears the burden of showing the discrimination occurred

24

within 180 days of the charge being filed.) Coleman has offered no evidence that she brought this claim within the time allowed by law.

Furthermore, Coleman's claim is due to be dismissed under the *McDonnell Douglas* analysis. First, Coleman cannot establish a *prima facie* case. A *prima facie* case for disparate treatment is (1) that the plaintiff belongs to a protected class; (2) that the plaintiff applied for and was qualified for the raise she sought; (3) that, despite the plaintiff's qualifications, her request for a raise was rejected; and (4) that similarly situated employees outside her protected class were given raises. *McDonnell Douglas*, 411 U.S. At 802. Coleman presents no evidence that at the time she allegedly requested and was denied the salary increase, that she was qualified for the pay increase. Coleman also cannot establish that increases were given to any whites or males at the time she allegedly asked for the pay increase. Therefore, Coleman cannot establish a *prima facie* case.

Even if Coleman could establish a *prima facie* case, Western Auto had a legitimate, nondiscriminatory reason for not giving her a pay increase. In her deposition, Coleman alleged that Enfinger's stated reason for not giving Coleman a salary increase "was. . . . something about they were going under percentages then and that's the range where we fell at." *Coleman's Nov. 27, 1997, Deposition* at 48. Assuming Coleman's testimony is true, the defendant had a legitimate, nondiscriminatory reason for not giving Coleman the salary increase.

Coleman has provided no evidence that the nondiscriminatory reason is pretextual. Coleman states the only evidence of discrimination on the salary increase

25

issue was "I had gone the extra mile." *Coleman's Nov. 27, 1997, Deposition* at 50. She admits that the only evidence of gender discrimination she has is "just out of hearsay." *Coleman's Nov. 27, 1997, Deposition* at 51-52. "[T]he inquiry into pretext centers upon the employer's belief, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). Therefore, Coleman's perception that she went "the extra mile" does not show that the defendant's actions were pretextual. As for the alleged "hearsay " statements, case law also holds they do not create a genuine issue of material fact. *Williams v. Hager Hinge Co.*, 916 F. Supp. 1163, 1168 (M.D. Ala. 1995). Therefore, Coleman cannot prove that Western Auto's legitimate nondiscriminatory reason for not giving her a pay increase is pretext.

Accordingly, Coleman's disparate pay claims are due to be dismissed for the following reasons: (1) both pay claims were abandoned; (2) both pay claims are time-barred under Title VII; (3) the disparate pay claim as to Casey is time-barred under § 1981, and to the extent that her pay claim arising from her denial of a pay increase occurred before April 27, 1997, it also is barred under § 1981; (4) Coleman failed to establish a *prima facie* case for either claim; (5) Western Auto offered a legitimate, nondiscriminatory reason for not giving Coleman a pay increase; and (6) Coleman cannot show that Western Auto's legitimate, nondiscriminatory reason for not giving her a pay increase is pretext.

### C. Coleman's Promotion Claim.

Coleman also alleges that she was discriminated against because of her gender and race when Tom Sweeting, a white male, was given the General Manager position of

26

the Bessemer store instead of her. This claim is also barred by the applicable statute of limitations period. Coleman was transferred from the Midfield store to the Bessemer store in August 1994. At the same time she was transferred, Sweeting was placed as General Manager of the Bessemer store. Because the alleged discriminatory event happened more than two years before Coleman's § 1981 claim was filed, her claim is barred. *Dunnin*, 892 F. Supp. at 1425-26. Coleman's Title VII claim is also barred because she did not file her EEOC claim within 180 days of the alleged unlawful employment practice. *Welty*, 605 F. Supp. at 1553.

Furthermore, even if Coleman's claims were not barred by the applicable statute of limitations period, Coleman's claim fails under the *McDonnell Douglas* analysis. To establish a *prima facie* case of discrimination in promotion, a plaintiff must prove (1) she is a member of a protected minority (2) she was qualified and applied for the promotion; (3) she was rejected despite these qualifications; and (4) other equally or less qualified employees who were not members of the protected minority were promoted. *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988). Coleman cannot establish a *prima facie* case because she cannot prove that she applied for the position of General Manager. Coleman stated that on the day Enfinger told her Sweeting was being placed as General Manager, she did not tell Enfinger she wanted the position. Coleman also provided no proof that Sweeting was equally or less qualified for the position when he was promoted.

Coleman also claims she should have been promoted to General Manager of the Bessemer store instead of P'Pool. However, Coleman cannot maintain an action under

27

Title VII because she filed her EEOC charge on June 10, 1996, more than 180 days after the July 1995 alleged discriminatory failure to promote.[10]

Coleman also failed to establish a *prima facie* case with regard to her July 1995 claim of failure to promote. Coleman produced no evidence that an equally or less qualified person who was not a minority was promoted. Coleman testified that P'Pool was in essence "demoted" when he was transferred from the Woodlawn store to the Bessemer store. Therefore, Coleman has no ground to allege that P'Pool was promoted to the position of General Manager of Bessemer.

However, at the time that P'Pool was transferred to the Bessemer store, Rodney Porterfield, a black male, was transferred to the Woodlawn store. This move was seen as a promotion because of the higher volume of the Woodlawn store; but Coleman alleges no claim of gender discrimination for her being overlooked for the General Manager of the Woodlawn store.

Even though Coleman cannot establish a *prima facie* case, Western Auto stated a legitimate, nondiscriminatory reason for transferring Coleman to the Woodlawn store as Store Manager instead of promoting her. Coleman stated that Enfinger told her that she and Porterfield worked well together at the Bessemer store and Western Auto needed a strong team at the Woodlawn store. Assuming *arguendo* that Enfinger made that statement, Enfinger expressed a legitimate, nondiscriminatory reason for Coleman not receiving the promotion. Although Coleman argues that P'Pool should have been

---

[10] Coleman's claim of discriminatory failure to promote as to the July 1995 incident is timely under § 1981, but does not survive summary judgment under the *McDonnell Douglas* test.

terminated for violating company policy rather than demoted to the Bessemer store, Western Auto, as the employer, is in the position to make those decisions, not Coleman. *Elrod v. Sears*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions"). Furthermore, Coleman presented no evidence that Western Auto's legitimate, nondiscriminatory reason for not promoting her is pretext.

Accordingly, Coleman's promotion claims are due to be dismissed for the following reasons: (1) Coleman's claim for failure to promote her to General Manager in August 1994 is time-barred; (2) Coleman's claim for failure to promote her to General Manager in July 1995 is time-barred under Title VII; (3) Coleman fails to establish a *prima facie* case for the failure to be promoted to General Manager of the Bessemer store in August 1994, as well as the failure to receive the Bessemer store General Manager position when P'Pool received it in July 1995; (4)Western Auto offered a legitimate, nondiscriminatory reason for not placing her as General Manager of the Bessemer store in July 1995; and (5) Coleman failed to provide evidence that Western Auto's legitimate, nondiscriminatory reason for failing to promote her to General Manager in July 1995 is pretext.

### D.    Coleman's Involuntary Transfer Claim.

Coleman claims that she was discriminated against on the basis of her race and gender when she was transferred to Store Manager of the Woodlawn store from Store Manager of the Bessemer store. This claim is due to be dismissed for the following reasons:

29

First, her race and gender claims under Title VII are barred because she did not file the EEOC claim within 180 days of the alleged employer unlawful incident. *Welty,* 605 F. Supp. at 1553. The alleged discriminatory event occurred in July 1995, the time of the transfer. Coleman filed her EEOC claim on June 10, 1996. Therefore, her claims under Title VII are barred by the applicable statute of limitations.[11]

Second, Coleman cannot state a claim of race and gender discrimination based on her transfer. In *Hudson v. Southern Ductile Casting Co.,* the Eleventh Circuit held that an involuntary transfer with no loss in benefits or pay did not amount to a demotion and therefore, there was no illegal discrimination. 849 F.2d 1372 (11th Cir. 1988). In this particular case, Coleman offered no evidence of lost benefits or pay when she was transferred to the Woodlawn store; nor has she offered evidence that the conditions of her employment at Woodlawn were significantly different. Therefore, she can claim no discrimination for the transfer to Woodlawn. Furthermore, on Coleman's Western Auto application, she indicated that she was willing to relocate. *Defendant's Exhibit 2.* The transfer to Woodlawn could be viewed as a relocation and Coleman indicated to the company that she was willing to do so. Moreover, Coleman has identified no evidence to suggest that employees outside her protected class were treated better than she. Therefore, Coleman cannot claim that she was discriminated against based on her transfer to Woodlawn from Bessemer.

---

[11] Although Coleman's involuntary transfer claim is timely under § 1981, Western Auto is still entitled to summary judgment of this claim under the holding in *Hudson v. Southern Ductile Casting Co.,* 849 F.2d 1372 (11th Cir. 1988), discussed *infra.*

Accordingly, Coleman's involuntary transfer claim is due to be dismissed for the following reasons: (1) the claim is time-barred under Title VII; (2) there was no loss in benefits or pay when Coleman was transferred to the Woodlawn store; and (3) Coleman stated on her Western Auto application that she was willing to relocate.

### E. Coleman's Termination Claim.

The next issue is whether Coleman can establish a claim of discriminatory discharge based on her termination of employment from Western Auto. Coleman alleges that the disparaging remarks made by Moore in reference to "Rosy" is evidence of discrimination against Coleman based on race and gender.[12] "Statements indicating racial bias on the part of a decision-maker in an employment setting can constitute direct evidence of racial discrimination in Title VII cases." *Trotter v. Bd. Of Trustees of Univ. Of Alabama*, 91 F.3d 1449 at 1455 (11th Cir. 1996). The statements must also be made by a person involved in the challenged decision. *Trotter*, 91 F.3d at 1453-1454. In *Price Waterhouse v. Hopkins,* the Supreme Court stated that "stray remarks. . . statements by non-decision-makers, or statements by decision-makers unrelated to the decisional process itself" are not direct evidence. 490 U.S. 228, 277 (1989).

Assuming Moore did make disparaging comments about "Rosy," which Moore adamantly denies, his comments would not constitute evidence of discrimination

---

[12]   After a thorough examination of the record, the court fails to find that Coleman raised a hostile environment claim. In *Meritor Sav. Bank v. Vinson*, the Supreme Court held that to prevail on a charge of hostile environment, the plaintiff must show that the conduct he complains of was "sufficiently severe or persuasive or persuasive to alter the conditions of the victim's employment and create an abusive work environment." The court went on to state that a "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." 477 U.S. 57. Because Coleman alleges that Moore made each disparaging remark only once and that the remarks were not directed at Coleman, a hostile environment claim, if raised, would fail under the *Meritor* test.

31

because Moore was not a decision-maker in Coleman's termination. Although Moore conducted the investigation of Coleman and Porterfield, Moore did not make the decision to terminate Coleman. Blackner stated that either he or White had authority to terminate Store Managers and General Managers. Blackner made the decision to terminate Coleman without even reviewing the report Moore prepared. Therefore, although Moore was involved in the investigative part of the case, Blackner and White were the decision-makers in regards to Coleman's termination and bias, if any, on the part of Moore could not have impacted the decision.

In *Holifield v. Reno*, the 11th Circuit held that to establish a *prima facie* case of discrimination under Title VII, the plaintiff must establish "(1) he belongs to a racial minority, (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." 115 F.3d 1555, 1562 (1997).

Coleman claims that Western Auto treated similarly situated white males more favorably than herself. Coleman presented no evidence that Blackner and White had any knowledge of the alleged wrongdoings of white male managers. Coleman admitted that she had not told any member of Western Auto management about the IOUs P'Pool had written and that she had torn up or the alleged void-afters and IOUs made by other management. Additionally, both Blackner and White became employed in their respective supervisory roles in the Birmingham area months after the alleged violations of the white male managers. See *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) stating that (courts have held that disciplinary measures undertaken by

different supervisors may not be comparable for purposes of Title VII analysis.)

Additionally, when White discovered that two white males in management had violated company policy at approximately the same time as Coleman and Porterfield were terminated, they were terminated immediately. White, as with Coleman, did not look over the files of Tippons and Anderson before terminating them. Therefore, these white males were treated the same as Coleman in the method in which they were terminated.

Even if Coleman could establish a *prima facie* case of discrimination, the defendant has proffered a legitimate business reason for the termination: Coleman's admitted violation of company policy regarding the void-after.   Discharging an employee for violating a work rule is a legitimate, nondiscriminatory reason. *Smith v. Papp Clinic P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987). ("If the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not because of race. . . .")

Coleman also failed to provide evidence sufficient to show that the reason was merely a pretext for invidious racial discrimination. Coleman states that the real reason she was fired was that Western Auto wanted to place Walter Green as General Manager of the Woodlawn store instead of her. Coleman has identified no evidence to suggest that Walter Green's placement had anything to do with Coleman's race or gender. Coleman stated it was "just pretty much hearsay" that Green was placed in the General Manager position. The court finds that this allegation amounts to nothing more than mere speculation and conjecture. "Conclusory allegations of discrimination, without

33

more, are not sufficient to raise an inference of pretext or intentional discrimination." *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988) (quoting *Grisgby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987). Therefore, Coleman's termination claims are also due to be dismissed.

Accordingly, Coleman's termination claim is due to be dismissed for the following reasons: (1) Coleman offered no direct evidence of discrimination; (2) Coleman failed to establish a *prima facie* case of discriminatory termination; (3) Western Auto offered a legitimate, nondiscriminatory reason for terminating Coleman; and (4) Coleman cannot show that Western Auto's legitimate, nondiscriminatory reason for the termination was pretextual.

### F.   Coleman's Claim of Disparate Treatment.

The final issue is whether Coleman was discriminated against when White allegedly told Coleman and Porterfield to call him "Mr. White," and told white employees to call him "Doug." A plaintiff alleging disparate treatment may prove a *prima facie* case through direct evidence of discrimination. *Burns v. Gadsden State Comm. College*, 908 F.2d 1512, 1517-18 (11th Cir. 1990). However, in *Allen v. City of Athens*, the court held that a white supervisor unwilling to shake a black employee's hand was "far too equivocal to qualify as direct evidence." 937 F. Supp. 1531, 1543 (N.D. Ala. 1996). Even if Coleman's allegation is true, which White denies, White could have had a number of reasons for not wanting Coleman and Porterfield to call him "Doug." White may not have personally liked Coleman and Porterfield or may have had another reason not related to the race of Coleman and Porterfield. "Personal animosity is not the

34

equivalent of . . .discrimination and is not proscribed by Title VII." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986). Green, the black male who replaced Porterfield, stated in his affidavit that White told him he preferred for Green to call him "Doug" rather than "Mr. White." This tends to support the argument that race was not a factor, if in fact White did tell Coleman and Porterfield to call him "Mr. White." Therefore, Coleman's disparate treatment claim is also due to be dismissed.

### V.    Conclusion.

Accordingly, the defendant's motion for summary judgment will be granted and all of Coleman's claims will be dismissed with prejudice. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this **$2\overline{6}^{th}$** of June, 1998.

Edwin L. Nelson
United States District Judge